IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. BARR

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JUSTIN M. BARR, APPELLANT.

Filed June, 13, 2017.    No. A-16-944.

Appeal from the District Court for Douglas County: TIMOTHY P. BURNS, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Leslie E. Cavanaugh for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Justin M. Barr was convicted following a jury trial in the district court for Douglas County of two counts of first degree sexual assault, second offense, and one count of first degree false imprisonment. The court subsequently sentenced Barr to concurrent terms of imprisonment of 20 to 25 years for each of the sexual assault convictions and 5 to 5 years for the false imprisonment conviction. On appeal, Barr asserts that the court erred by admitting certain testimony, that there was insufficient evidence to support his convictions, and that the court erred in imposing excessive sentences. For the reasons set forth herein, we affirm.

### BACKGROUND

On September 11, 2015, the State filed an information in the district court, charging Barr with two counts of first degree sexual assault, second offense, in violation of Neb. Rev. Stat. § 28-319 (Reissue 2016), both Class II felonies, and two counts of first degree false imprisonment

in violation of Neb. Rev. Stat. § 28-314 (Reissue 2016), both Class IIIA felonies. Specifically, the State alleged that Barr sexually assaulted and falsely imprisoned A.E. on or about August 17 and J.T. on or about August 21. The false imprisonment count with respect to J.T. was subsequently dismissed.

Barr filed two motions in limine, seeking to prohibit the State from adducing any out-of-court statements or identifications made by the two victims in this case. Barr asserted that such evidence should be excluded because it would be inadmissible hearsay, would violate his right of confrontation, and would be unfairly prejudicial under Neb. Rev. Stat. § 27-403 (Reissue 2016).

Following a hearing on May 11, 2016, the district court sustained Barr's motion in limine with respect to J.T.'s statements to the nurse who conducted her sexual assault examination. The State was unable to locate J.T. at the time of that hearing. Another hearing was held on May 16. At that point, J.T. was still unavailable as a witness. After receiving additional evidence and hearing further argument from the parties, the court found the evidence the State intended to offer through the personnel of the hospital where J.T. was treated "would not be testimonial" and that "some, if not all, of the statements made during the course of . . . treatment at [the hospital] would be admissible under the medical diagnosis and treatment hearsay exception to the hearsay rule." During the second hearing, the court also addressed the admissibility of statements that J.T. made to John McDonough the day after her alleged sexual assault by Barr. At that time, the State had not been able to locate McDonough. The court sustained Barr's motion in limine with respect to statements J.T. made to McDonough, but it indicated that it was willing take up the issue again if McDonough was located and testified at trial. Finally, the court overruled Barr's motion with respect to A.E., finding that her statements to the nurse who conducted her sexual assault examination would be admissible under the medical diagnosis and treatment hearsay exception. A.E. was expected to testify at trial so there was not a confrontation issue with respect to her statements.

A jury trial was held on May 16-19, 2016. In addition to various photographic and other exhibits, the State offered testimony from A.E., J.T., McDonough, and various law enforcement and medical personnel. Barr testified in his own behalf.

The evidence at trial shows that in August 2015, A.E. did not have a home of her own and was staying with friends. She had previously lived at a particular homeless shelter for a few months. On August 17, after her work ended around 5 p.m., A.E. went to the shelter to visit friends. While A.E. was talking with her friends outside the shelter, a man whom A.E. did not know approached and began talking with them. The man introduced himself as "J." After the group dispersed, the man approached A.E. again "about getting together and talking." A.E. told him "[she] would, no problem." At trial, A.E. identified Barr as the man who had approached her on August 17.

A.E. left her purse and backpack with some individuals she knew and then went to meet Barr. A.E. thought they were going to walk down an alleyway and then sit in an area in the middle of the alley, talk, and maybe smoke a cigarette. A.E. denied having an agreement to go with Barr and have sex in exchange for methamphetamine. She also denied having an argument with Barr about methamphetamine and feeling "short-changed" and trying to grab Barr's methamphetamine.

According to A.E., Barr wanted to go to the end of the alley and, after they reached an area between a basketball court and a building, Barr grabbed her from behind and started choking her. A.E. clawed and kicked and eventually removed Barr's hand from her neck. At the same time, however, Barr was punching A.E. in the face with his other hand, so A.E. told him he "didn't have to do that" and that she would "do anything he wanted [her] to do." Barr told A.E. to take off her clothes, and A.E. began to do so. She removed her pants and jacket, but Barr "tore open" her shirt and cut off her bra with a box cutter. Barr then penetrated A.E.'s vagina with his penis. At trial, A.E. described a "constantly repeated" cycle of vaginal, anal, and oral penetration by Barr's penis. A.E. testified that Barr would periodically tap the box cutter on her shoulder "just so [she] knew it was there." In describing the area where the initial assault occurred, A.E. testified that she was "caged in" and "trapped" by an area of fence and that Barr kept her from "getting out." At some point, he told her that he wanted to start a prostitution ring together and that she would be in charge of the girls.

Eventually it began raining really hard, and Barr told A.E. to put on her clothes and climb the fence. A.E. did so, and they entered a nearby construction site. According to A.E., Barr was right behind her and held onto her as they climbed the fence. A.E. did not think she could run fast enough to get away. Because of the rain, A.E. kept falling down in the bushes and Barr kept "dragging [her] back up." He had her get inside "a small tractor" with "a scoop on the front of it." Barr got into the loader as well and had A.E. take her clothes off again. Inside the loader, Barr again penetrated A.E. vaginally, anally, and orally. Barr also had A.E. digitally penetrate Barr's anus. A.E. testified that she continued to do as Barr asked because she "didn't know what to do" and she "couldn't get away." She thought that he would use the box cutter on her if she tried to escape. At some point Barr began to talk about how "[they] were going to go to California and make pornographic movies." Eventually, the rain stopped and daylight approached.

When other vehicles began pulling up to the site, Barr started to get nervous and "wanted to get out of there." Barr took his clothes, got out of the "little tractor," walked around to the back of the tractor, and motioned for A.E. to follow him. A.E. got dressed and instead of following Barr, she went quickly toward the construction workers who had arrived. A.E. told the construction workers what happened, and they had her sit in one of their vehicles while one of them called the police.

Law enforcement received a call to respond to the construction site at approximately 7 a.m. on August 18, 2015, and after the scene was processed, A.E. was transported to the hospital. The officer who transported A.E. to the hospital testified that one of A.E.'s eyes was swollen, her clothes were "loose and torn," she was crying, and she appeared to be shaking. Photographs of A.E. taken after the assault show bruising on various parts of A.E.'s body, including her face and neck. A.E. testified that she did not have the bruises shown in the photographs prior to the assault. A bra that had been cut or torn was recovered from the loader by police after the assault, and A.E. identified it at trial as hers.

A.E. was examined at the hospital by Jennifer Vogler, who is a registered nurse and qualified as a sexual assault nurse examiner (SANE). On that morning, Vogler was working as the "triage nurse" in the emergency room and was "on-call for the sexual assault." When Vogler first had contact with A.E., she observed that A.E. was disheveled and had a black eye, but was

otherwise coherent and did not appear to be under the influence of either alcohol or drugs. Vogler described the triage process as a quick interview to "find out the chief complaint," to check vital signs to make sure the patient is stable, and to determine where to send the patient next. Vogler testified that as the triage nurse, it was important for her to know what brought A.E. to the hospital and that she relied on what A.E. told her to direct her treatment from that point.

The district court overruled Barr's hearsay objections to Vogler's testimony about A.E.'s description of the assault, but the court granted a continuing objection. When Vogler asked A.E. what happened, A.E. reported that she was sexually assaulted and beaten. Vogler then took A.E. to a different examination room for a more detailed interview and examination. Vogler obtained a medical history from A.E. and asked for further details about what happened. Vogler testified that such details are important for the treatment and diagnosis of emergency room patients and that the information A.E. provided, as well as Vogler's physical observations of A.E., were pertinent to Vogler's treatment and diagnosis of her. A.E. told Vogler that she was vaginally, anally, and orally penetrated throughout the night by a man named "J" who had wielded a box cutter during the assault. A.E. reported that the man also hit her in the face and strangled her, and Vogler could see bruising around A.E.'s neck and that A.E. had a black eye.

After getting the history of the sexual assault from A.E., Vogler took A.E. to an exam room and conducted a forensic examination. Vogler observed bruises all over A.E.'s face and neck, as well as the rest of her body. A.E.'s genital area was red and swollen with contusions, and there was also a gravel-like substance inside the labial walls of A.E.'s vagina. A rectal examination showed that A.E.'s rectum was similarly red and swollen, had a small tear, and contained the same gravel-like substance. Vogler testified that the injuries were consistent with blunt force trauma and A.E.'s explanation of what happened. After being released from the hospital, A.E. went to the police station to speak further with officers about the assault.

On August 20, 2015, A.E. was on a city bus when she observed Barr, whose name she still did not know, get onto the bus with an older woman. A.E. stated that she took off her sunglasses to "make sure it was him" and that Barr recognized her, after which he "turned straight forward" and "wouldn't look back anywhere." A.E. borrowed another passenger's cell phone and called 911 to report the presence on the bus of the man who had assaulted her. Law enforcement contacted the bus company, which subsequently provided a copy of the bus' surveillance video. The video was admitted into evidence and shows details consistent with A.E.'s testimony.

The second assault at issue in this case occurred on August 21, 2015. On that date, J.T. was walking to a store near the homeless shelter around 9 or 9:30 a.m. when she was approached by a man whom she had not previously met. At trial, J.T. identified Barr as the man who approached her. According to J.T., Barr referenced her actual name, introduced himself as "Jason" and began talking about starting a brothel and putting her in charge of the girls. J.T. did not think the man was serious and started laughing, which she testified "kind of triggered some anger." Barr then asked J.T. if she "got high," and when she responded affirmatively, Barr asked her to follow him down a nearby embankment. J.T. testified that although she was a methamphetamine user at that time, she was not high on the morning of August 21 when Barr approached her. J.T. denied having any sort of negotiation with Barr for the drugs prior to following him. She was under the presumption that he was going to share the drugs with her.

J.T. followed Barr down the embankment, and Barr "pull[ed] out a syringe that ha[d] debris" or "grass particles" in it. When J.T. tried to jerk her arm away, Barr grabbed her and pushed her down. Barr then started ripping off J.T.'s clothes, took off his clothes, and "started to forcefully try to get [her] interested in having sex with him." When J.T. resisted, Barr placed a box cutter against her throat and said, "Shut up, bitch, if you don't, I'm going to kill you . . . this is going to happen whether you like it or not."

Barr then engaged in what J.T. described as "rough, animalistic" and "brutal" sexual intercourse with her. J.T. testified that Barr penetrated her orally and vaginally with his penis and "made [her] insert [her] fingers into his rectum at the same time." When J.T. started to scream, Barr stuffed his wadded up shirt into her mouth. According to J.T., the initial assault continued for several hours, after which Barr drug her to a makeshift campsite, which was near a marsh or a swamp-like area. J.T. testified that "it was very, very slow-going" and took about an hour to walk to the campsite from the location of the initial assault due to the dense surrounding vegetation. At the campsite, Barr forced J.T. to the ground, again ripped off her clothes, and attempted to penetrate her from behind. Although Barr's penis was flaccid at that point, he continued trying to penetrate her, and J.T. eventually felt her pelvis starting to bruise. When J.T. tried to scream, Barr pushed her face down into the "watery muck." He also held the box cutter against her neck and told her not to scream. At some point, Barr penetrated J.T.'s vagina with the dull end of the box cutter, and said, "Do you like daddy's little toy?" At another point, J.T. asked Barr "why he was doing this to her," and he replied, "Because it was done to me."

J.T. did not get away from Barr until near sundown, at which point she headed toward the homeless shelter and encountered McDonough in a nearby alleyway. J.T. told McDonough what had happened. She described herself as "exhausted," "enraged," and "in shock" at this point. J.T. planned to go to the hospital the following morning and spent the night with McDonough and another friend in a tent at a homeless campsite outside the shelter. The next morning, J.T. saw Barr approaching the tent and identified him to McDonough as the man who had sexually assaulted her. McDonough then confronted Barr. At trial, the district court overruled Barr's objection to J.T.'s testimony about identifying her attacker to McDonough.

After confronting Barr, McDonough walked J.T. to a hospital. Because the first hospital did not have a sexual assault kit available, J.T. was subsequently transported by police to a second hospital. The police officer who transported J.T. to the second hospital observed J.T. to be "tired and scared and frightened."

The State also presented testimony from the registered nurse, Michelle Keays, who examined J.T. at the first hospital before she was taken to the second hospital. Keays has taken a 40-hour SANE training class but has not taken the test to become a certified SANE. J.T. arrived at the emergency room of the first hospital around 9 a.m. on August 22, 2015. After J.T. was "triaged" by another nurse, Keays was assigned as her primary nurse. Keays inquired about what brought J.T. to the hospital because such information is important and pertinent to the treatment and diagnosis of patients. Over Barr's hearsay objection, which the court overruled, Keays testified that J.T. reported that she had been raped repeatedly. Keays performed a physical assessment and observed that J.T. had scratches and abrasions all over her back and legs. Keays observed J.T. to be visibly upset and crying. J.T. was also assessed by a physician's assistant at the first hospital.

Photographs of J.T. taken subsequently at the second hospital show numerous scratches and abrasions primarily on her back and legs.

McDonough testified about his encounters with J.T. and Barr. McDonough was in an alley near the homeless shelter on August 21, 2015 when J.T. came wandering down the alley around 9 or 10 p.m. According to McDonough, J.T. was distraught and sobbing, fell to her knees, and told him that a man had raped her. The district court overruled the hearsay objections made by Barr's attorney to McDonough's description of what he was told by J.T. McDonough testified that J.T. told him she went with the man to get high, that the sexual contact was initially consensual, but that when she wanted to stop having sex, the man drug her into the woods and raped her with a box cutter. According to McDonough, J.T. told him the events she described had occurred about 30 minutes prior. McDonough testified that J.T. continued to cry while she told him what happened and that it took her about 45 minutes to finish telling him because "she was going back and forth between relief that she was away . . . and alive, and then she would go backwards and just be crying and in a lot of pain." McDonough encouraged J.T. to report the sexual assault right away, but he indicated that she "didn't have the physical strength to really want to do anything" and that she wanted to rest until morning. McDonough confirmed that J.T. rested with him and another individual at a homeless campsite for about six hours.

The following morning, after J.T. identified Barr to McDonough as the individual who had assaulted her, McDonough, who recognized Barr from being "in rehab with him for a while," confronted him about what happened. The district court overruled Barr's hearsay objections both to McDonough's report of J.T.'s identification of Barr and of his conversation with Barr. According to McDonough, Barr told him that he "pitched" J.T. on getting high and "doing what we do" and that when J.T. was "ready to stop," Barr was not, so he pulled out the box cutter. McDonough was asked to clarify what he meant by "do what we do," and he testified that "sex and drugs are all intertwined together. . . . [M]ost people don't do it unless they have a girl to do it with."

Later on August 22, 2015, after identifying Barr as the suspect in the sexual assaults of A.E. and J.T., police apprehended and arrested Barr outside of his residence. Barr had multiple scratches and insect bites on his body and a box cutter in his back pocket. A.E. was shown a picture of the box cutter at trial and confirmed that it was the same one Barr wielded when he sexually assaulted her.

After Barr was arrested, he was taken to the police station and interviewed, a copy of which was introduced at trial. Barr admitted during his interview that he recently had sexual contact with both A.E. and J.T., but he claimed that it was consensual and denied threatening either of them. Barr acknowledged that he had the box cutter with him, but he denied using or threatening to use it on either A.E. or J.T.

Barr testified in his own defense and denied sexually assaulting either A.E. or J.T. Barr claimed that on August 17, 2015, after buying some methamphetamine, he encountered A.E., whom he had not met before, near the homeless shelter and asked her if she "partie[d]." Barr testified that by "partying" he meant "[d]rugs for sex" and affirmed that when A.E. "indicated that she wanted to party, that was basically what was being implied." According to Barr, they smoked methamphetamine together in the alley and then had consensual sex in the alley. He testified that

he used the box cutter to cut up the methamphetamine and to cut off A.E.'s bra because he got impatient as she was getting undressed, but he denied threatening her with it. Barr stated that they went into the construction site when it started raining where they continued to get high and have sex in a "Bobcat." According to Barr, he and A.E. argued because A.E. demanded her own bag of methamphetamine, which was not his understanding of their arrangement. Barr stated that he punched A.E. in the face because she tried to grab his bag of methamphetamine while they were arguing. Barr testified that they did not have sex after that but stayed where they were until construction workers began to arrive, at which point they parted ways.

With respect to his encounter with J.T., Barr claimed that after purchasing some methamphetamine, he encountered J.T., whom he had seen earlier in the day but had not known previously, near the homeless shelter. Barr testified that he asked J.T. "if she parties," told her he was "trying to fuck," and J.T. responded that she "was down," which Barr indicated meant she was in agreement. According to Barr, they smoked methamphetamine together, had consensual sex, and then moved to another location where they continued having sex. Barr testified that he gave J.T. an "empty promise" that he would get her more drugs and that they had sex one more time before parting ways. Barr denied sexually assaulting J.T., stuffing a shirt in her mouth, or threatening her with the box cutter. Barr testified that the following morning, McDonough accused him of raping J.T. and that he also understood from the discussion that J.T. and McDonough were upset that Barr had "promised [J.T.] more drugs" and that she "hadn't gotten that payment."

The jury found Barr guilty of all three charged offenses. The district court accepted the verdict and entered judgments of conviction on each count. Following an enhancement hearing, the court enhanced both sexual assault convictions to second offenses based on Barr's 2003 conviction for first degree sexual assault of a child. The court sentenced Barr to 25 to 50 years' imprisonment on each count of first degree sexual assault and 5 to 5 years' for the false imprisonment conviction with all sentences to run concurrently.

## ASSIGNMENTS OF ERROR

Barr asserts that the district court erred in admitting certain testimony of Vogler with respect to statements made by A.E. under the medical diagnosis or treatment hearsay exception and admitting certain testimony of McDonough with respect to statements made by J.T. under the excited utterance hearsay exception. He also asserts that the evidence was insufficient to support his convictions and that the court imposed an excessive sentence.

## STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Lester*, 295 Neb. 878, ___ N.W.2d ___ (2017). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id.* Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination whether the court admitted evidence over a hearsay

objection or excluded evidence on hearsay grounds. *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017).

In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Lester, supra*. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Dehning*, 296 Neb. 537, 894 N.W.2d 331 (2017). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

ANALYSIS

*Medical Diagnosis or Treatment Hearsay Exception.*

Barr asserts that the district court erred in admitting certain testimony of Vogler with respect to statements made by A.E. under the medical diagnosis or treatment hearsay exception. Specifically, Barr argues that Vogler should not have been allowed to testify over his hearsay objection that A.E. told her that "J" backed her into a caged area with a "chain fence" where some of the assault occurred, that they climbed a couple of fences into a construction site, and that more of the assault took place inside a "mini tractor." Barr also argues that Vogler should not have been allowed to testify over his hearsay objection that A.E. told her the man had shown her a box cutter several times "to remind her."

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Neb. Rev. Stat § 27-801(3) (Reissue 2016). Hearsay is not admissible at trial except as provided by the Nebraska Evidence Rules. See Neb. Rev. Stat. § 27-802 (Reissue 2016). The State argues that A.E.'s statements to Vogler were properly admitted under the hearsay exception for medical diagnosis or treatment found in Neb. Rev. Stat. § 27-803(3) (Reissue 2016).

Section 27-803(3) provides that the hearsay rule does not exclude "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Section 27-803(3) is based on the notion that a person seeking medical attention will give a truthful account of the history and current status of his or her condition in order to ensure proper treatment. *State v. Vigil*, 283 Neb. 129, 810 N.W.2d 687 (2012). Whether a statement was both taken and given in contemplation of medical diagnosis or treatment is a factual finding made by the trial court in determining the admissibility of the evidence under § 27-803(3), and an appellate court reviews that determination for clear error. *Id*. The appropriate state of mind of the declarant under § 27-803(3) may be reasonably inferred from the surrounding circumstances. *Id*.

In this case, the district court properly admitted A.E.'s statements to Vogler under the medical diagnosis or treatment exception. A.E. was at the hospital seeking treatment following a prolonged and brutal sexual assault. Her statements were made to a nurse who was providing her with treatment. A.E.'s statements about the assault provided context to allow Vogler to correctly assess and treat her injuries. Vogler explained that an understanding of what brought the patient to the hospital is important in determining what further care that patient might need and where to "place" the patient after the examination.

Barr argues that the fact that A.E. told Vogler that she was caged in and climbed over a fence, that a portion of the sexual assault occurred in a mini tractor, and that she was shown a box cutter are not facts which were pertinent to her medical diagnosis as they were not descriptions of her medical history, "or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof." See § 27-803(3). He argues that these particular statements were offered "simply to slop in hearsay to emphasize that [A.E.] gave a somewhat consistent statement later," which would not have been a proper purpose for admitting the statements under § 27-801(4)(a)(ii). Brief for appellant at 18. Section 27-801(4)(a)(ii) provides that a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive."

Vogler's testimony about A.E.'s statements was not admitted under § 27-801(4)(a)(ii) and as we discuss above, A.E.'s description of the entire assault provided context for Vogler to understand what happened to her and to provide her treatment. While A.E. may not have received physical injuries from being caged in, climbing over a fence, and being shown a box cutter, those details may have been pertinent to an assessment of the need for any psychological treatment and were properly allowable under § 27-803(3). See *State v. Vigil, supra* (details of abuse are relevant to psychological implications regardless of whether physical injury occurred). In *State v. Vigil*, the Nebraska Supreme Court stated that

> Evaluation of the need for psychological treatment is a fundamental component of sexual assault cases and, thus, a component of medical diagnosis and treatment in such cases. Where an individual is alleged to be the victim of sexual assault, statements reasonably pertinent to medical diagnosis and treatment of both physical and psychological trauma are admissible under rule 803(3).

*State v. Vigil*, 283 Neb. at 140-41, 810 N.W.2d at 697-98.

Even if some of A.E.'s statements to which Vogler testified did not fall under § 27-803(3), any error in admitting those statements was harmless. Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error. *State v. Lester*, 295 Neb. 878, ___ N.W.2d ___ (2017). Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt. *Id.* A.E.'s statements to Vogler about "J" being the perpetrator, the location of the sexual

assault, and Barr having a box cutter were clearly harmless given that Barr admitted to these details. During Barr's post-arrest interview and at trial, Barr admitted that he had sex with A.E., that some of the encounter took place in a "Bobcat," and that he had a box cutter with him. A.E. also testified about the details of the assault. The facts that were disputed at trial were whether the sexual contact between them was consensual and whether Barr threatened A.E. with the box cutter. The jury's guilty verdict was surely unattributable to A.E.'s statements to Vogler about the details of where the incident took place and with whom, which statements were cumulative to the other evidence described above. This assignment of error is without merit.

*Excited Utterance Hearsay Exception.*

Barr asserts that the district court erred in admitting certain testimony of McDonough with respect to statements made by J.T. under the excited utterance hearsay exception. Barr argues that McDonough's testimony about J.T.'s statements concerning what happened to her and her identification of Barr to McDonough as her assailant were improperly admitted under the excited utterance exception due to the timing and circumstances of the statements.

Section 27-803(1) provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. For a statement to be an excited utterance, the following criteria must be met: (1) There must be a startling event; (2) the statement must relate to the event; and (3) the declarant must make the statement while under the stress of the event. *State v. Hale*, 290 Neb. 70, 71, 858 N.W.2d 543, 544-45 (2015). Excited utterances are an exception to the hearsay rule, because the spontaneity of excited utterances reduces the risk of inaccuracies inasmuch as the statements are not the result of a declarant's conscious effort to make them. *State v. Britt*, 293 Neb. 381, 881 N.W.2d 818 (2016). The justification for the excited utterance exception is that circumstances may produce a condition of excitement which temporarily stills the capacity for reflection and produces utterances free of conscious fabrication. *Id.* The Nebraska Supreme Court has explained that "the time interval between the startling event and the statement in question is not, of itself, dispositive of the spontaneity." *State v. Pullens*, 281 Neb. 828, 847, 800 N.W.2d 202, 221 (2011). The true test for an excited utterance is not when the exclamation was made but whether, under all the circumstances, the declarant was still speaking under the stress of nervous excitement and shock caused by the event. *State v. Hale, supra.* Facts relevant to whether a statement is an excited utterance include the declarant's manifestation of stress, the declarant's physical condition, and whether the declarant spoke in response to questioning. *Id.*

According to McDonough, when he encountered J.T. wandering down an alley at 9 or 10 p.m. on August 21, 2015, she was dirty, distraught, afraid, and "didn't look good at all." When McDonough approached J.T., she started to fall to her knees and sob heavily as she told McDonough what happened 30 minutes to an hour earlier. McDonough testified that it took J.T. about 45 minutes to tell him what happened because she continued to alternate between "relief that she was away and there and alive" and "crying and in a lot of pain." J.T. was too exhausted to go right to the hospital and needed to stop and rest frequently as they walked to McDonough's campsite.

Barr argues that J.T. had time for reflection because she encountered McDonough about 30 minutes to an hour after her last contact with Barr and that even before that "Barr and [J.T.] had both calmed down, put on clothes, and agreed to part ways." Brief for appellant at 30. Barr also notes the length of time it took J.T. to tell McDonough what happened. Neither the length of time between the last sexual assault and when J.T. encountered McDonough nor the amount of time it took J.T. to tell McDonough what happened are dispositive. J.T. was sexually assaulted by Barr multiple times over the course of many hours. Her statements to McDonough related to her encounter with Barr and she was visibly upset and clearly still under the stress of those events when she told McDonough what happened.

Barr also argues that McDonough's testimony about J.T.'s identification to McDonough the following morning of Barr as the individual who sexually assaulted her should not have been admitted as an excited utterance. We disagree. To encounter Barr again upon stepping outside of the tent the morning after enduring the sexual assault described above was undoubtedly a startling event in and of itself. McDonough testified that upon seeing Barr that morning, J.T. "just turned around and she started shaking and she said, That's him." Again, J.T. was visibly upset and while more time had passed since the last sexual assault, she identified Barr to McDonough immediately upon seeing him approach the tent that morning.

Regardless of whether J.T.'s statements to McDonough either in the alley or the following morning qualified as excited utterances, any error in the admission of McDonough's testimony about those statements was harmless. McDonough testified at trial that he confronted Barr about what happened and that Barr admitted that he had sex with J.T., as well as the fact that he pulled out a box cutter because J.T. was ready to end the sexual encounter but he was not. McDonough identified Barr in court as the individual he confronted outside the tent that morning. J.T. also identified Barr in court as the individual who sexually assaulted her and testified about the events of the assault. And, as discussed above, Barr admitted during his post-arrest interview and at trial, that he had sex with J.T. and that he had a box cutter with him. In addition, the nurse who examined J.T. at the first hospital the morning after the assault testified that J.T reported she had been repeatedly raped near the homeless shelter. Barr does not assign error to the receipt of this testimony. In other words, most of the information relayed to McDonough by J.T. came in through other witnesses, including Barr. The jury's verdict was surely unattributable to McDonough's testimony about the statements J.T. made to him. See *State v. Lester*, 295 Neb. 878, ___ N.W.2d ___ (2017). Barr's assignment of error is without merit.

We note that Barr also argues that the district court improperly admitted J.T.'s testimony about having identified Barr to McDonough the morning after the sexual assault over Barr's hearsay objection. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Chacon*, 296 Neb. 203, 894 N.W.2d 238 (2017). Accordingly, we do not address this argument further except to note that any error in admitting this testimony was harmless. See *State v. Lester, supra*.

*Sufficiency of Evidence.*

Barr asserts that the evidence was insufficient to support his convictions. Barr was charged with two counts of first degree sexual assault (one against A.E. and another against J.T.) and one count of first degree false imprisonment (against A.E.).

A person commits first degree sexual assault if the person "subjects another person to sexual penetration . . . without the consent of the victim." § 28-319(1).

> Sexual penetration means sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes. Sexual penetration shall not require emission of semen.

Neb. Rev. Stat. § 28-318(6) (Reissue 2016). A person commits first degree false imprisonment if the person "knowingly restrains or abducts another person (a) under terrorizing circumstances or under circumstances which expose the person to the risk of serious bodily injury; or (b) with intent to hold him or her in a condition of involuntary servitude." § 28-314.

The evidence shows that Barr sexually penetrated both A.E. and J.T. without their consent. The evidence also shows that Barr sexually assaulted A.E. in a confined area and threatened her with the box cutter throughout the duration of the assault. A.E. testified that she was scared, did not think she could get away from Barr, and thought he would cut her if she tried to do so. When the evidence received at trial is viewed in a light most favorable to the State, any rational trier of fact could have found the essential elements of all three charged crimes beyond a reasonable doubt. Barr attacks the credibility of both A.E.'s and J.T.'s testimony, but this court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, which are matters for the finder of fact. See *State v. Lester, supra*. This assignment of error is without merit.

*Excessive Sentence.*

Barr asserts that the district court imposed an excessive sentence. Barr was convicted of two counts of first degree sexual assault, second offense, and one count of first degree false imprisonment. Barr's offenses took place prior to certain amendments made to Nebraska's sentencing laws by 2015 Neb. Laws, L.B. 605 that went into effect on August 30, 2015. At the time of Barr's offenses, first degree sexual assault, second offense, was a Class II felony, which was punishable by a mandatory minimum of 25 years' imprisonment and a maximum of 50 years' imprisonment. § 28-319; Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014). First degree false imprisonment was a Class IIIA felony punishable by a maximum of 5 years' imprisonment. § 28-314; § 28-105. Accordingly, the district court's concurrent sentences of imprisonment for 25 to 50 years for each count of first degree sexual assault, second offense, and a concurrent sentence of 5 to 5 years for first degree false imprisonment were within statutory limits.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Chacon*, 296 Neb. 203, 894 N.W.2d 238 (2017).

When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the offense. *Id.* The sentencing court is not limited to any mathematically applied set of factors. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

At the sentencing hearing, the district court considered the facts of this case, the arguments made by the parties, and the information found in the presentence investigation report (PSR). The court placed particular weight on the seriousness of Barr's crimes and his prior criminal history. At the time of the PSR, Barr was 32 years old. He had a high school education and had some college credits. He was not employed and had a spotty employment history due to drug abuse issues. Barr has a lengthy criminal history, which includes felony convictions for burglary, sexual assault, failure to register as a sex offender, and assault by a confined person. On the Level of Service/Case Management Inventory, he scored in the very high risk to reoffend category, and the probation officer recommended consecutive periods of incarceration.

The district court did not abuse its discretion in considering the relevant factors and did not impose an excessive sentence. This assignment of error is without merit.

## CONCLUSION

The district court did not err in admitting the testimony of Vogler and McDonough complained of by Barr. The evidence was sufficient to support Barr's convictions, and the court did not abuse its discretion in sentencing Barr.

AFFIRMED.